IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WENDY F.[1],**

      **Plaintiff,**

                                Civil Action 2:23-cv-3730
                                Judge Edmund A. Sargus, Jr.
                                Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Wendy F., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits ("DIB").  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 12), Plaintiff's Reply (ECF No. 13), and the administrative record (ECF No. 7).  The Undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors (ECF No. 10) and **AFFIRM** the Commissioner's decision.

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

I.  BACKGROUND

Plaintiff previously applied for DIB on May 27, 2011, alleging that she has been disabled since December 9, 2009, due to PTSD, anxiety, hypertension, depression, scoliosis, back spasms and RSD (Rejection sensitive dysphoria). (R. at 187-93, 232.) Plaintiff's application was denied initially in September 2011 and upon reconsideration in January 2012. (R. at 74-114, 117-33.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 134-42.) On March 22, 2013, Plaintiff, who was represented by counsel, appeared and testified at a hearing held by an administrative law judge. (R. at 38-72.) On June 7, 2013, Anne Shaughnessy ("ALJ Shaughnessy") issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 16-37.) The Appeals Council denied Plaintiff's request for review, and she filed suit in this Court. *See* [*Wendy F.*] *v. Comm'r of Soc. Sec.*, S.D. Ohio Case No. 2:14-cv-1911. (R. at 1001-1003.) This Court remanded the matter for further proceedings. (R. at 987-96.)

On remand, the claim was heard by ALJ Timothy Keller. After a hearing on January 19, 2017, ALJ Keller found on February 21, 2017, that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. (R. at 945-51, 1005-38.) The Appeals Council granted Plaintiff's request for review and remanded the matter for further proceedings. (R. 1039-1043.)

On remand, the claim was heard by ALJ Jeffrey Hartranft. After a hearing on January 28, 2020, ALJ Hartranft found on March 20, 2020, that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. (R. at 900-44,

860-99.) The Appeals Council denied Plaintiff's request for review, and she again filed suit in this Court. See [*Wendy F.*] *v. Comm'r of Soc. Sec.*, S.D. Ohio Case No. 2:20-cv-3732. Upon a Joint Motion for Remand, this Court remanded the matter for further proceedings. (R. at 4405-08.)

On remand, the claim was heard again by ALJ Hartranft. After a hearing on July 31, 2023, ALJ Hartranft found on August 15, 2023, that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. (R. at 4258-4298.) Plaintiff did not request review by the Appeals Council opting to directly file suit with this Court. This matter is properly before this Court for review.

## II. RELEVANT RECORD EVIDENCE

The Undersigned has thoroughly reviewed the transcript in this matter, including Plaintiff's medical records, function and disability reports and testimony as to her conditions and resulting limitations. Given the claimed errors raised by the Plaintiff, rather than summarizing that information here, the Undersigned will refer and cite to it as necessary in the discussion of the parties' arguments below.

## III. ADMINISTRATIVE DECISION

On August 15, 2023, ALJ Hartranft issued his decision. (R. at 4258-4298.) The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on

3

December 31, 2014. (R. at 4263.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of December 9, 2009 through her date last insured of December 31, 2014. (*Id.*) The ALJ found that, through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, sacroiliitis, obesity, and affective, anxiety, and stressor/trauma-related disorders. (R. at 4264.) The ALJ further found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 4265.)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> Through the date last insured, [Plaintiff] had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could occasionally climb ramps and stairs, but could not climb ladders, ropes, or scaffolds. She was capable of frequent balancing, kneeling, crouching, and

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can [Plaintiff] perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

>crawling, and occasional stooping. She could have had occasional exposure to temperatures below freezing, but would have needed to avoid workplace hazards, such as unprotected heights, machinery, and commercial driving. She would have been capable of simple, routine, and repetitive tasks involving only simple work related decisions and with few, if any, workplace changes. She could have worked in positions that did not have strict production quotas or fast paced work, such as on an assembly line. She could have worked in positions that did not require interaction with the general public and only occasional interaction with coworkers and supervisors with no persuasion or conflict resolution responsibilities or tandem tasks.

(R. at 4268.)

At step four of the sequential process, the ALJ determined that, through the date last insured, Plaintiff was unable to perform any of her past relevant work as a paramedic/emergency medical services coordinator, teacher aide, hand packager, and store laborer. (R. at 4282.) At step five, relying on the VE's testimony, and the ALJ concluded that, through the date last insured, considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, such as a sorter, addresser or table worker. (R. at 4283-4284.) The ALJ therefore concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from December 9, 2009, the alleged onset date, through December 31, 2014, the date last insured. (R. at 4284.)

**IV.  STANDARD OF REVIEW**

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices [Plaintiff] on the merits or deprives [Plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

V. **ANALYSIS**

Plaintiff raises two separate issues in one statement of error relating to the ALJ's analysis of the opinions of Dr. Barnett, a treating physician. First, Plaintiff asserts that the ALJ erred by failing to apply the controlling weight test. Further, Plaintiff contends that the ALJ failed to comply with the controlling regulation, 20 C.F.R. §404.1527. (ECF No. 10 at PageID 4773-4780.) The Commissioner counters that the ALJ's decision makes clear that the opinions of Dr. Barnett do not meet the criteria for controlling weight. Additionally, the Commissioner argues that the ALJ plainly determined that Dr. Barnett's opinions merited little weight, giving good reasons to support that determination. (ECF No. 12 at PageID 4788-4793.)

In evaluating a claimant's case, the ALJ must consider all medical opinions that she or he receives. 20 C.F.R. § 404.1527(c). The applicable regulations[3] define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical

---

[3] "Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017." *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *5 n.2. (N.D. Ohio Feb. 21, 2019) (citing 82 Fed. Reg. 5844-5884 (Jan. 18, 2017)). Plaintiff's claims here were filed before March 27, 2017, before the new regulations took effect.

evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 404.1527(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Further, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that

>his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed [Plaintiff] as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ expressly consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision). Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d)(2); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

The starting point for the Court's analysis here is the ALJ's discussion of Dr. Barnett's opinions. The ALJ had this to say about those opinions:

> *** [I]n April 2012, treating psychologist Dr. Barnett reported that he did not believe [Plaintiff] would be capable of successfully participating in any form of employment at that time (Exhibit 20F). In October 2012, Dr. Barnett opined that [Plaintiff] had marked to extreme limitations in social interaction, regardless of whether she had only minimal interaction with others; marked to extreme

9

> limitations in sustained concentration and persistence; and moderate, marked, and extreme limitations in adaptation (Exhibit 26F). He suggested that her condition was likely to deteriorate if she was placed under stress, particularly the stress of an eight hour day, five days per week job. He suggested that she was likely to have partial or full day unscheduled absences from work occurring five or more days per month due to her conditions and/or side effects of medications. He opined that she was not able to handle stress, as she became very anxious and her stress could also trigger panic attacks. He indicated that she became irritated and was easily angered; that she would have severe difficulty interacting with the public or working with coworkers; and that she would have difficulty functioning on a regular work schedule. On various reports for worker's compensation, and in treatment notes, he variously indicated mild, moderate, or marked impairment in the functional domains of activities of daily living, adaptation, social functioning and concentration, persistence, and pace (for example, see Exhibits 38F at 2, 4, 6, 8, 10, 12, 14, 16, 18, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45, 47, 49, 51, 53, 55, 58, 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92; 48F at 7, 10, 12, 15, 17, 18, 21, 27, 39, 51, 54, 56, 62). I note that, on November 25, 2014, which was a little over a month from [Plaintiff]'s last insured, he indicated only mild impairment in those domains, except for moderate impairment to concentration, persistence, and pace (Exhibit 38F at 84). In his treatment notes, he indicated that she did not handle stress at all, that it often led to panic like features; that her social functioning was limited to family, though she was beginning to have some social contacts on a very limited basis; that she had some reduction in concentration and focus; and that she had a slow pace in completing tasks, poor persistence, and easy agitation, though she could do her own activities of daily living (Exhibits 22F, 29F, and 38F).

(R. at 4278-4279.) The ALJ then assigned "little weight" to Dr. Barnett's assessments, reasoning as follows:

> Although Dr. Hill, Dr. Barnett, and Dr. Bell were "treating sources" as defined in the regulations, their opinions concerning [Plaintiff]'s disability status were not well supported by medically-acceptable clinical and laboratory diagnostic techniques, and were inconsistent with other substantial evidence in the case record. The question of disability is a matter reserved for the Commissioner (Social Security Ruling 96-5p). Neither Dr. Hill nor Dr. Barnett provided a function-by-function analysis covering an extended period, and Dr. Bell's assessment was for a limited duration. Dr. Barnett's indications of marked versus mild or moderate functional limitations varied widely, and, in any event, the longitudinal record does not support the presence of marked limitations.… With respect to her mental impairments, the above-summarized record generally documents substantially normal mental status functioning even during periods of heightened mental

10

> symptomatology, and the above-identified mental residual functional capacity is consistent with a low stress work environment with reduced interactions with others, which addressed her need to avoid high stress and intense interpersonal interactions. Additionally, [Plaintiff]'s activities of living were substantial, including independent functioning, long trips, a cruise, internet usage, computer games, care of a niece, and occasional dining out, and the record documents that she had driven more frequently that she had alleged, including to the numerous medical appointments and through big cities during a trip to Florida. The record documents numerous and regular medical treatment during which [Plaintiff] interacted well with medical providers. Despite the many medical treatments over the years, there is no documentation of significant panic attacks during such treatments.

(R. at 4279.)

As noted, Plaintiff's first argument is that the ALJ did not apply the controlling weight test to the opinions of Dr. Barnett, a treating source. The apparent basis for this argument is the ALJ's failure to use the phrase "controlling weight" in analyzing the opinion. This argument is not well-taken. As the above excerpt confirms, the ALJ explicitly recognized Dr. Barnett as a treating source. Then, the ALJ specifically considered whether Dr. Barnett's opinion was "well supported by medically-acceptable clinical and laboratory diagnostic techniques" and whether it was "not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)). And, the ALJ unquestionably concluded that neither of these conditions was met. In doing so, the ALJ determined that the opinion was not entitled to controlling weight. Thus, there is no merit to Plaintiff's characterization that the ALJ "skip[ped] ahead, past the controlling weight test."

Indeed, Plaintiff's later argument recognizes as much, suggesting that her claimed error is not that the ALJ did not apply the test, but that his resulting conclusion, in part, is not supported

11

by substantial evidence. That is, Plaintiff goes on to argue that the ALJ provided only "a cursory declaration that Dr. Barnett's opinions were inconsistent with the record." (ECF No. 10 at 12.) This slightly revised, and contradictory, argument fares no better.

First, as set forth above, immediately before considering whether Dr. Barnett's opinions were entitled to controlling weight, the ALJ discussed those opinions in some detail. (R. at 4278-4279.) Elsewhere in his decision, the ALJ also discussed, at length, Plaintiff's mental health treatment records:

> ***She had a history of regular psychotherapy with psychologist Richard Barnett, Ph.D., as well as treatment from Hong Kang, M.D., who prescribed Klonopin and Celexa. The doctors' progress notes reflected ups and downs in [Plaintiff]'s condition, as to be expected, but there was a general trend of improvement (Exhibits 9F, 17F, 22F, 25F, 38F, 46F, 48F, and 79F). For example, a May 2010 treatment note confirmed that she could do her own activities of daily living, including dressing, bathing, grooming, engaging in very light house work, and driving limited distances, as well as socializing with family (Exhibit 46F at 55). During a May 2010 psychological evaluation, she reported that she was able to care for all of her basic personal needs, including feeding, bathing, dressing, and toiletries, though she sometimes needed help into or out of the bathtub if she bathed instead of showering (Exhibit 46F at 63). She reported that she drove and had driven to the psychological evaluation alone. She reported that she was able to do basic reading, writing, math, and money management (Exhibit 46F at 64). She reported that she did most of her own light domestic chores and ran short errands. She reported that she played games on her laptop, read, worked crossword puzzles, and made a baby blanket. She reported minimal social contacts with family and friends. In September 2010, she reportedly had driven a few times and was going to try to take a two-day bus trip to Illinois for a football game (Exhibit 46F at 30). In October 2010, she extended her limits on driving and tried to get out of the house each day (Exhibit 46F at 26). In November 2010, she reported that she was dressing every day, working hard at getting better, and was making progress (Exhibit 46F at 12), and she was doing some driving (Exhibit 46F at 24). In December 2010, she reported that she had anxiety attacks in the evening time but was less depressed and agitated, and she was cooperative, coherent, relevant, alert, and well oriented, with intact memory, intellectual functioning, judgment, and insight (Exhibit 46F at 9).

In February 2011, [Plaintiff] drove herself to an appointment with her psychologist, was on time, and did not have any panic attacks on the way (Exhibit 47F at 124). She indicated that she could go to a store that was not crowded without difficulty. She had begun journaling. In March and May 2011, she reported that as long as she took her medication, she was doing better, and her medication helped her (Exhibits 17F at 12; 46F at 6). In April 2011, she reported almost daily anxiety attacks, but she appeared less depressed and was cooperative, coherent, alert, and well oriented, and she had intact memory and intellectual functioning (Exhibit 46F at 7). In June and August 2011, she reported doing better (Exhibit 17F at 13, 15).

\*\*\*

In June 2012, [Plaintiff] reported helping a niece who was staying with her for the summer get over a trauma she suffered, getting out of the house more, and doing more things (Exhibit 22F at 10). In August 2012, Dr. Barnett reported that [Plaintiff]'s prognosis was good and her condition improved (Exhibit 29F at 35). In September 2012, [Plaintiff] reported feeling a lot better since her Wellbutrin was increased (Exhibit 25F at 3). Similarly, in October 2012, she reported that as long as she took her medications, she felt better, and longitudinal treatment notes routinely indicated that she was casually dressed and cooperative; she was less withdrawn, less depressed, and less agitated; her affect was appropriate with no suicidal ideation, homicidal ideation, or mood swings; her judgment and insight were unimpaired; her memory was normal; she was alert and well oriented to all three spheres; she denied having delusional thoughts or hallucinations; she was coherent and relevant; and she had no medication side effects (Exhibits 17F at 9, 11, 12, 13; 22F; 25F at 2-6, 8; and 29F). In December 2012, she exhibited a depressed mood but had normal speech, behavior, judgment, thought content, cognition, and memory (Exhibit 30F at 4).

In January 2013, [Plaintiff] was fully oriented and had a normal affect and judgment (Exhibit 34F at 3). In February 2013, she was alert, oriented, and cooperative (Exhibit 30F at 7). In March 2013, she had an appropriate mood, manner, grooming, and personal hygiene (Exhibit 44F at 4).

In June, July, and November 2013, she had a depressed mood but normal speech, behavior, judgment, thought content, cognition, and memory (Exhibit 35F at 18, 33, 45). In August 2013, she reportedly continued to make progress in her driving, as it was not as difficult for her, and her level of irritability had improved (Exhibit 38F at 18). Elsewhere, she appeared anxious, but she denied any suicidal or depressive thoughts (Exhibit 39F at 47). In October 2013, she was alert, awake, fully oriented, and fluent, and she was able to comprehend and differentiate on a mental status examination (Exhibit 35F at 55). In December 2013, she reportedly had no psychiatric complaint, and she was alert and attentive (Exhibit 39F at 48).

In January 2014, [Plaintiff] reportedly had been able to drive herself alone to every appointment and was not troubled by flashbacks, and she reportedly had attended a football game in the fall (Exhibit 38F at 20). In February 2014, she reported that she was going on a trip to Florida to take her father's ashes there with her mother (Exhibit 48F at 58). In March 2014, she indicated that the trip had entailed driving through big cities (Exhibit 48F at 60). In March, April, July, August, September, and December 2014, she had an appropriate mood and affect and intact recent and remote memory (Exhibit 36F at 3, 11, 14, 15, 19, 23, 28, 32). In January, February, May, June, October, and December 2014, she had a depressed mood but normal speech, behavior, judgment, thought content, cognition, and memory (Exhibit 35F at 64, 82, 101, 116, 132, 150). In August 2014, she reportedly was coping well with living on her own, getting out of the house more often, driving with less difficulty, and reaching out to her friends (Exhibit 48F at 6). On December 31, 2014, her date last insured, she had a normal mood and appropriate affect (Exhibit 36F at 39).

Even in July and December 2015, well after the date last insured, the claimant had a normal affect and was fully oriented (Exhibit 34F at 49, 62). The record otherwise documents continued treatment more than a year after the date last insured (Exhibits 57F-73F, and 76F).

In summary, the claimant had posttraumatic stress and symptoms of affective and anxiety-related disorders, but the record documents that she generally retained stable mental status functioning even in times of heightened symptomatology. She also developed posttraumatic stress disorder from a motor vehicle accident, with her biggest reported issues related to driving and hearing emergency vehicle sirens. Contrary to her reports, including testimony at hearing, she had significant improvement with medications. There were some issues with non-compliance and she noted her symptoms were significantly worse on those occasions. She was able to drive to appointments, and she was able to drive to Florida, including in large cities (Exhibit 48F). She did exhibit reduced stress tolerance, but she was able to cope with the stress of a divorce. During one exam she stated that she felt that she was able to tolerate stress and deal with the people and problems in her life (Exhibit 48F). She was socially withdrawn and showed some irritability, but she was able to attend a football game and sit in the crowd (Exhibit 36F). One exam found that she was most likely overstating her symptoms (Exhibit 55F). Because of concentration issues and low stress tolerance, she was limited to simple, routine, and repetitive tasks involving only simple work related decisions and with few, if any, workplace changes, as well as requiring positions that did not have strict production quotas or fast paced work, such as on an assembly line. Because of her tendency to isolate and become irritable, she required positions that did not require interaction with the general public and only occasional interaction with coworkers and supervisors with

> no persuasion or conflict resolution responsibilities or tandem tasks. Because of her increased anxiety while driving, she needed to avoid commercial driving.

(R. at 4274-4277.)

Earlier in his decision, the ALJ also thoroughly discussed Plaintiff's activities of daily living as documented from August 2011 through January 2014. By way of some quick examples, the ALJ noted that in February 2012, Plaintiff reported that "she and her husband shopped and ran errands together," she did some "of the cooking, cleaning, and housework," dined out with her husband once a week" and had traveled to Florida and gone on a cruise with her family. (R. at 4266.) In December 2012, Plaintiff exhibited good immediate, recent, and remote memory, and her concentration abilities were unimpaired. (R. at 4267.) In June 2013, Plaintiff reported that she cared for her basic needs independently, handled her personal finances, took vacations, took her prescribed medications, and used her computer daily. (*Id*.) In January 2014, Plaintiff reported that her daily activities included "light housework, some laundry, using the telephone, preparing full meals on occasion, reading, watching television, listening to the radio, occasionally grocery shopping, visiting relatives, dining out, working puzzles, using a home computer to play games, going to the gas station and pharmacy, attending medical appointments and therapies, attending a flea market once, driving alone to Columbus, handling her own finances, and doing some crocheting." (*Id*.)

> The ALJ concluded his extensive review of Plaintiff's activities with the following:
>
> In summary, the record through the date last insured documents a wide range of activities of daily living, including driving various distances, doing light housework, talking to people on the phone, preparing meals on occasion, watching television, shopping about once a month, dining out as often as once a week, using a computer for games, emailing, using Facebook, looking up information on line,

15

> reading, doing crossword puzzles, making baby blankets, and caring for all of her basic personal needs. Additionally, she traveled to Florida twice and had also been on a cruise. Consistent with this evidence, I find that she had some deficits in the four domains of functioning but also significant abilities corresponding to each domain. Consistent with this evidence, she had "moderate" limitation in understanding, remembering, or applying information, "moderate" limitation in interacting with others, "moderate" limitation in concentrating, persisting, or maintaining pace, and "moderate" limitation in adapting or managing oneself.

(R. at 4267-4268.)

The ALJ also addressed the opinions of other mental health professionals, summarizing the evidence relied upon in evaluating those opinions as follows:

> … The summarized evidence also documented long trips, a cruise, internet usage, care of a niece, and occasional dining out. The records did show that she developed PTSD from the motor vehicle accident, with her biggest reported issues as driving and hearing emergency vehicle sirens, but, contrary to her prior testimony, she had significant improvement with medications. There were some issues with non-compliance and she noted her symptoms were significantly worse on those occasions. She was able to drive to appointments. She was able to drive to Florida, including in large cities (Exhibit 48F). She did exhibit reduced stress tolerance but was able to cope with the stress of a divorce. During one examination, she stated that she felt she was tolerating stress and dealing with the people and problems in her life. She had some social withdrawal and irritability; however, she was able to attend a football game and sit in the crowd (Exhibit 26F). One examination found that she was likely overstating her symptoms (Exhibit 55F). Still, I find that the above limitations to simple, routine, repetitive tasks and no strict production quotas are appropriate due to reduced stress tolerance. Interaction limitations are appropriate due to isolation and irritability. Commercial driving limitations are appropriate due to increased anxiety when driving.

(R. at 4278.)

Importantly, the ALJ's decision is to be read as a whole and, the ALJ is not required to restate factual analyses throughout the decision. *Norris v. Comm'r of Soc. Sec.*, 461 F. Appx. 433, 440 (6th Cir. 2012) ("So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review");

*see also Six v. Comm'r of Soc. Sec.,* No. 1:21-CV-841, 2022 WL 4946087, at *5 (W.D. Mich. Sept. 12, 2022), *report and recommendation adopted*, No. 1:21-CV-841, 2022 WL 4941036 (W.D. Mich. Oct. 4, 2022) (the Sixth Circuit has emphasized that an ALJ's decision is to be read as a whole, and the ALJ is not required to restate his factual analysis throughout the decision). Thus, the ALJ's considerable discussion of Plaintiff's mental health records, set forth in his 24-page opinion, supports the ALJ's conclusion that Dr. Barnett's opinion was inconsistent with other substantial evidence in the case record. And, it undercuts Plaintiff's characterization of the ALJ's efforts as "cursory" and without "citations to anything specific in the record." (ECF No. 10 at 12.)

Plaintiff also contends that the ALJ did not provide the necessary good reasons for rejecting Dr. Barnett's treating source opinions. Initially, Plaintiff takes issue with the ALJ's statement that Dr. Barnett did not provide a function-by-function analysis covering an extended period. Plaintiff points out that Dr. Barnett's assessment was a function-by-function analysis documenting Plaintiff's specific and clear mental limitations. (R. at 753-755.) Further, Plaintiff suggests that, because the assessment was dated October 7, 2012, and Dr. Barnett began treating Plaintiff in early 2010, his assessment provided a sufficient longitudinal view. This, however, was not all the ALJ had to say about Dr. Barnett's assessment. The ALJ also noted that Dr. Barnett's indications of functional limitations "varied widely" and the longitudinal record did not support the presence of marked limitations. Moreover, the ALJ, citing the summarized record, noted substantially normal mental status functioning even during periods of heightened symptomatology, claimant's substantial activities of daily living, and the lack of documentation

demonstrating significant panic attacks during the numerous instances of medical treatment Plaintiff had had over the years. (R. at 4279.)

For her part, Plaintiff asserts that the fluctuations reflected in Dr. Barnett's treatment notes are consistent with the nature of a mental health disorder. Again, the ALJ acknowledged Plaintiff's fluctuations but noted that, even in times of heightened stress, Plaintiff had substantially normal mental status functioning. This leaves Plaintiff to argue that the ALJ selectively reviewed the record. On this point, Plaintiff cites portions of her medical history which, in her view, are favorable to her. That is, Plaintiff does not contend that the ALJ mischaracterized the evidence on which he relied, only that the record "contains a great deal of evidence documenting [her] severe and disabling conditions." (ECF No. 10 at 16.) In essence, Plaintiff argues that the ALJ cherry-picked the record. The Sixth Circuit, however, has observed that what one might argue is "cherry-picking," might "be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). Indeed, cherry-picking arguments are "seldom successful" because "crediting [them] would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (internal citation omitted). Here, the ALJ did not "cherry pick" the record. That matters because, "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Here, Plaintiff has not demonstrated that the ALJ's conclusions were based on less than substantial evidence. Although Plaintiff may not agree with the ALJ, that disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269,

2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016). Accordingly, the Undersigned finds no error in the ALJ's evaluation of Dr. Barnett's opinion.

## VI. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore, **RECOMMENDED** that Plaintiff's Statement of Errors (ECF No. 10) be **OVERRULED,** and that the Commissioner's decision be **AFFIRMED.**

## VII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a forfeiture of the right to *de novo* review by the District Judge and forfeiture of the right to appeal the judgment of the District Court. Even when timely objections are filed, appellate review of issues not raised in those objections is forfeited. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's

report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:   December 10, 2024                    */s/ Elizabeth A. Preston Deavers*
                                             **ELIZABETH A. PRESTON DEAVERS**
                                             **UNITED STATES MAGISTRATE JUDGE**